IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| S.C., by and through her<br>Parents E.T. and R.C.,<br><br>        Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF EDUCATION, STATE<br>OF HAWAII,<br><br>        Defendant. | )   Civ. No. 12-00524 ACK-BMK<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER AFFIRMING ADMINISTRATIVE HEARINGS OFFICER'S FINDINGS OF FACT & CONCLUSIONS OF LAW

The Court hereby AFFIRMS the Hearings Officer's decision dated August 21, 2012. Plaintiffs failed to show that the 2009 and 2010 IEPs did not offer S.C. a free and appropriate public education or were not properly implemented.

## STATUTORY FRAMEWORK

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., was enacted by Congress to, among other things, "ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A) & (B). The IDEA gives federal money to state and local education agencies to help them educate disabled children, on the condition that the state and local agencies implement the substantive and procedural

requirements of the IDEA. See R.P. v. Prescott Unified Sch. Dist., 631 F.3d 1117, 1121 (9th Cir. 2011).

Under the IDEA, state and local education agencies must identify children with disabilities and develop annual Individual Education Programs ("IEPs") for them. 20 U.S.C. § 1414. An IEP is a comprehensive, individualized document developed by a team of parents, teachers, and other school administrators, which details the child's present levels of academic achievement and goals, the criteria for measuring progress, and the services and accommodation that the school commits to providing. Van Duyn ex rel. Van Duyn v. Baker Sch. Dist., 502 F.3d 811, 827 (9th Cir. 2007); see 20 U.S.C. § 1414(d)(1)(A).

The IDEA also provides "substantial procedural safeguards" to ensure that the child receives a FAPE. Anchorage Sch. Dist. v. M.P., 689 F.3d 1047, 1054 (9th Cir. 2012). States must comply with both the procedural and the substantive requirements of the IDEA. K.D. v. Dep't of Ed., State of Haw., 665 F.3d 1110, 1114 (9th Cir. 2011). When a parent disagrees with the process or content of an IEP, the parent may challenge that IEP by demanding an administrative due process hearing. See 20 U.S.C. § 1415(b)(6), (f). A parent may also enroll the child in a private program, and, upon establishing that the public school district failed to provide a FAPE, may seek reimbursement. See id. § 1412(a)(10)(C)(ii).

## FACTUAL & PROCEDURAL BACKGROUND

In this case, S.C., by and through her parents (together "Plaintiffs") challenge two IEPs created for S.C. by the Hawaii Department of Education ("DOE").

S.C. is a seven-year-old girl with severe developmental delays. (See, e.g., Record on Appeal ("ROA") Ex. 1 at 4.) The parties dispute whether S.C. has an autism spectrum disorder. (See, e.g., Evidentiary Hearing Transcript ("Tr.") at 6:6-8:9.) She also has visual problems and hypotonia (muscle weakness). (See, e.g., ROA Ex. 1 at 4.)

In June 2008, S.C. was made eligible for special education due to her developmental delays. (Tr. at 16:12-21.) The DOE performed numerous assessments and observations of S.C. at that time, including reports by an occupational therapist, a psychologist, and a physical therapist. (See DOE Exs. 34-39.) The DOE developed an IEP that is not at issue here for S.C.'s 2008-2009 school year, and she began attending preschool at her home school, Blanche Pope Elementary School, in the "fully self-contained" special education class. (Tr. at 388:19-25.) S.C.'s special education preschool teacher, Megan Clark, was S.C.'s teacher for two and a half years, until S.C.'s parents removed S.C. from Pope Elementary in December 2010. (Id. at 15:9-16, 391:6-10.) Ms. Clark testified that she provided approximately 85% of S.C.'s instruction during her time at Pope Elementary. (Id. at 92:13-93:1.)

3

At some point during S.C.'s time at Pope Elementary, Ms. Clark filled out a questionnaire designed to help her create a Behavioral Support Plan for S.C. (Id. at 78:1-11, 18-25.) In response to the prompt "Please list existing and any past diagnoses, medical or psychiatric," Ms. Clark wrote: "Seizures. DD [developmentally delayed]. MR [mentally retarded]." (Pl. Ex. 42 at 932.) Ms. Clark later testified that at the time she filled out the questionnaire, she considered S.C. to be mentally retarded.[1/] (Tr. at 77:2-8.) She also testified, however, that there was no significant difference between programming for children who are developmentally delayed and those who are mentally retarded. (Id. at 77:12-17.)

I.   Drafting & Implementation of the 2009 IEP

The first IEP challenged here was issued on June 2, 2009. (See DOE Ex. 15 ("2009 IEP").) The 2009 IEP contained sections drafted by the various specialist service providers who had assessed S.C. and had seen her throughout her first school year. (See Tr. at 25:22-32:7.) Ms. Clark also drafted parts of the IEP and created the first full draft of the document. (Id. at 84:14-25.) S.C.'s parents attended the IEP meetings and participated in developing the IEP. (Id. at 393:6-19.) They

---

[1/] The Court understands the more accepted terminology to be "intellectually disabled." See Am. Psychiatric Ass'n, Intellectual Disability 1 (2013), http://www.psychiatry.org/File%20Library/Practice/DSM/DSM-5/DSM-5-Intellectual-Disability-Fact-Sheet.pdf. Since both parties, various witnesses, the Hearings Officer's decision, the exhibits, and counsel at oral argument all used the phrase "mentally retarded," however, for clarity's sake the Court will do the same.

4

reviewed the descriptions of S.C.'s present levels of educational performance, goals, and services, and gave input. (Id. at 448:22-449:18.) Ms. Clark testified that at that time, the IEP team had a "very strong relationship" with S.C.'s parents. (Id. at 33:5-13.)

Ms. Clark testified extensively about the approaches she used with S.C. during the 2009-2010 school year. (See generally id. at 40:1-46:6.) Ms. Clark used Applied Behavioral Analysis ("ABA") methodologies in her classroom. (See id. at 44:12-45:16, 92:3-12.) She also used Verbal Behavior ("VB") methodologies. (Id. at 11-88:9.)

S.C.'s mother, E.T., met with Ms. Clark quarterly and received progress reports from her. (Id. at 394:13-17; see id. at 391:11-19.) She also received a daily communication log from Ms. Clark, and the service providers logged their work with S.C. (Id. at 25:13-21, 426:24-427:3, 450:10-451:7.) E.T. visited S.C.'s classroom at least once a quarter. (Id. at 453:15-21.)

Ms. Clark testified that as the school year passed, she looked at the daily data collected about S.C. and adjusted her instruction accordingly. (Id. at 45:17-46:6.) Ms. Clark testified that she believed she had fully implemented the goals and objectives of the 2009 IEP. (Id. at 48:9-12.) She testified that S.C. had progressed in focus and participation, was able to walk in line with her classmates independently, to rote count to three, and to explore her environment and interact with other children more effectively. (Id. at 55:14-25.) Ms. Clark also

testified that S.C. had made significant progress in language skills over the year. (Id. at 66:16-67:8.) In sum, she testified that S.C. had "thrived" in her classroom. (Id. at 53:1-3.)

II.  Drafting of the 2010 IEP

In spring 2010, S.C.'s IEP team decided to have S.C. reevaluated to prepare for her possible transition to kindergarten. (Id. at 48:14-24.) The DOE performed numerous assessments and observations of S.C., including reports from a pediatric ophthalmologist, a speech/language therapist, an audiological report, and an assessment from Ms. Clark. (See DOE Exs. 46-55.)

At a spring 2010 meeting, E.T. saw S.C.'s results on the Assessment of Basic Language and Learning Skills ("ABLLS"), an educational tool designed to measure basic linguistic and functional skills. (Tr. at 399:11-400:11; see Pl. Ex. 23.) E.T. felt that the ABLLS showed little progress. (Tr. at 400:25-401:7.) She spoke to an educational consultant who referred her to Ana King (id. at 402:2-10), a board-certified assistant behavioral analyst (id. at 471:23-472:8). Ms. King owns her own company providing services to children with autism spectrum disorders, ADHD, and other issues. (Id. at 529:19-530:9.) She employs approximately seven skills trainers. (Id.)

In April 2010, a DOE psychologist, Susan Massey, assessed S.C. and issued an "Emotional/Behavioral Assessment" dated April 27, 2010. (DOE Ex. 52). At the end of the lengthy report, Ms. Massey summarized that S.C.'s level of functioning

"should be considered consistent with a significant level of mental retardation" and that her difficulty in focusing her attention was "most likely primarily due to mental retardation." (Id. at 394.) Dr. Abby Royston, another DOE psychologist who was involved in drafting the report, testified at the evidentiary hearing that S.C. was at the time "functionally within the range" of mental retardation, but that with so young a child "you're not making a statement that this is the child's cognitive development and . . . this is where it's going to stay." (Tr. at 925:10-23; see id. at 947:12-24 ("[W]hat it was talking about was current function, which at four years old [is] simply a much more reasonable approach . . . because this child is not done developing.").)

          S.C. had never been diagnosed with mental retardation. (Id. at 406:22-407:2.) Understandably, E.T. was "shocked" and upset by Ms. Massey's report. (Id. at 407:8-12, 408:22-410:1.) E.T. testified that until she saw that report, she had not known how severe S.C.'s problems in school were. (Id. at 427:10-428:2.)

          Ms. Massey also included in her report the results of autism testing performed by Ms. Massey and Dr. Royston. (See DOE Ex. 52 at 382.) The two psychologists found that S.C. did not meet the criteria to be diagnosed with an autism spectrum disorder. (Id. at 390.) Dr. Royston testified at the evidentiary hearing that although S.C. was not within the autism spectrum, she was close, and that Dr. Royston and Ms. Massey had "seriously considered and struggled with" the question of whether S.C. had

an autism spectrum disorder. (Tr. at 917:2-25.) S.C.'s generally very low level of functioning made the tests difficult to interpret; Dr. Royston explained that at the time of the assessment, S.C. was functioning overall at a low level, and her social skills were not clearly lower than her overall level of functioning. (Id. at 923:3-20.)

The DOE did not change S.C.'s eligibility criterion as a result of Ms. Massey's report; S.C. remained eligible for special education in the category of developmental delay. (Id. at 50:7-17.)

The DOE issued a new IEP for S.C. on May 17, 2010, after four IEP meetings. (See DOE Ex. 16 ("2010 IEP").) S.C.'s parents again attended the IEP meetings and reviewed the present levels of educational progress, goals and objectives, and services. (Tr. at 449:24-450:9.) The IEP team discussed whether S.C. should be moved up to kindergarten for the 2010-2011 school year, but ultimately decided to keep her in the preschool class. (Id. at 842:11-19.) The 2010 IEP contained a new description of S.C.'s current functioning, spanning four and a half single-spaced pages. (2010 IEP at 62-66.) It also contained new goals and benchmarks, and matched those benchmarks to ABLLS goals. (Id. at 69-85.)

III. Implementation of 2010 IEP

On July 13, 2010, Ms. King, the outside assistant behavioral analyst hired by S.C.'s parents, performed a formal observation of S.C. at Pope Elementary. (See DOE Ex. 56 at 415-

16.) E.T. testified that Ms. Clark was rude to E.T. and Ms. King on the morning of the observation and refused to allow Ms. King into the classroom without a written statement of her purposes. (Tr. at 418:1-21.) At a later debriefing meeting, Ms. King sharply criticized the education S.C. was receiving at Pope Elementary. (See id. at 848:5-850:9.) Beginning in July 2010, skills trainers from Ms. King's company began going to S.C.'s house after school to work with her. (Id. at 528:8-15.) Ms. Clark testified at the evidentiary hearing that she had a good relationship with S.C.'s parents for S.C.'s first two years at school, but that the relationship deteriorated after S.C.'s parents hired Ms. King. (Id. at 70:6-71:10.)

Ms. King observed S.C. in school again in mid-August 2010, during a speech therapy session. (See DOE Ex. 56 at 420; Tr. at 418:24-419:14.) She wrote a report of her observations later that month. (DOE Ex. 56.) Ms. King wrote in her report and later testified that ABA and VB procedures, including S.C.'s "sensory diet," were not being effectively implemented at Pope Elementary and that the teaching staff were not collecting enough daily data, and were not collecting it timely enough, to be helpful. (See, e.g., Tr. at 511:18-514:12, 515:12-516:24.)

Later in August 2010, Ms. King performed two assessments of S.C., the ABLLS and the VB Milestones Assessment and Placement Program. (Id. at 488:5-8; see DOE Ex. 57 at 425.) Ms. King and her skills trainers then began working with S.C. one-on-one for about two hours per day after school, using the

9

ABA and VB approaches. (Id.; Tr. at 404:3-405:3.) E.T. testified at the evidentiary hearing that S.C.'s progress under Ms. King's after-school program was "amazing" and that S.C. was "able to start communicating a little bit." (Tr. at 405:4-6, 15-16.) She also testified that after two weeks of the after-school program, S.C. was able to sit down at a table with her hands together. (Id. at 411:12-16.) Before starting Ms. King's program, S.C. had been unable to sit still for more than a few minutes. (Id. at 424:7-14.) Both Ms. King and E.T. testified that they invited S.C.'s DOE providers to come and observe Ms. King's at-home work with S.C., but that they did not come. (Id. at 527:24-528:7.)

        The relationship between S.C.'s parents and the DOE appears to have deteriorated over the fall of 2010. E.T. testified that it was "getting more and more difficult" for her to communicate with S.C.'s IEP team. (Id. at 429:17-21.) She testified that the school principal had told her that all communications should go through the principal, not through Ms. Clark. (Id. at 430:9-16.) At an October 2010 IEP meeting, E.T. asked that the DOE speech therapist, Sally Mow, be dismissed from S.C's IEP team because E.T. did not believe that S.C. was making progress in speech therapy and because she felt that S.C. did not enjoy working with Ms. Mow. (Id. at 407:22-409:7.) The DOE refused to switch S.C. to the school's other speech therapist. (Id. at 408:2-7.) E.T. testified that a DOE representative told her that the DOE felt that S.C. was not

making progress in speech therapy because of her low cognitive ability. (Id. at 408:7-9.)

In October or November of 2010, the DOE had a trained one-to-one skills trainer begin working with S.C. (Id. at 430:24-431:22.) S.C., who is frightened by stairs because she has problems with depth perception, bit the skills trainer's face after the skills trainer had S.C. go up to and climb down from a loft area. (Id. at 421:2-22.)

Ms. Clark nonetheless testified that she was able to fully implement the goals of the 2010 IEP for as long as S.C. remained at Pope Elementary. (Id. at 68:16-69:2.)

IV.  S.C.'s Move to Private School

On November 23, 2010, E.T. told Ms. Clark that she planned to remove S.C. from Pope Elementary and enroll her in a private school. (DOE Ex. 62 at 659.) S.C.'s last day at Pope Elementary was December 14, 2010. (Id. at 664.)

S.C.'s parents enrolled S.C. at a local private preschool, Cole Academy. (Tr. at 432:13-433:4.) S.C. was then six years old, but was in a class with neurotypical four- and five-year-olds. (Id. at 433:17-24.) Cole Academy's preschool class runs from 8 AM to noon. (Id. at 433:13-16.) Cole Academy itself did not provide occupational therapy, physical therapy, or speech/language services; rather, S.C.'s parents hired private providers for these services. (Id. at 444:24-445:3, 466:13-467:2.) S.C. had a one-on-one skills trainer, an employee of Ms. King's company, with her during the four hours a day at Cole

11

Academy, and also had an intense after-school program at home with a skills trainer for two and a half to three hours in the afternoon. (Id. at 433:5-13, 434:3-21, 466:3-12.) S.C.'s parents paid around $700-$800 a month for S.C.'s tuition at Cole Academy, $6,000-$8,000 per month for the skills trainer, $2,000-$3,0000 per month for Ms. King's own services, and around $120 per hour for occupational therapy and physical therapy services. (Id. at 444:17-445:5.)

On December 13, 14, and 16, 2011, a private psychologist hired by S.C.'s parents, Lesley Cook, tested S.C. and also observed her at Cole Academy at around the same time. (Id. at 322:8-21.) Dr. Cook diagnosed S.C. with an autism-spectrum disorder but found that she was not mentally retarded. (See Pl. Ex. 51.) Dr. Cook's intelligence tests gave S.C. a full scale score of 71. (Id. at 1039.) The cutoff for a diagnosis of mental retardation is an IQ of 70 or below.[2]

E.T. testified at the evidentiary hearing that S.C. progressed significantly after being enrolled at Cole Academy with services provided by Ms. King. (Tr. at 440:21-24.) When asked to describe S.C. as she was in May 2010, E.T. testified: "She wasn't really a child then. It's [] awful for a parent to say." (Id. at 426:5-6.) Describing S.C. as she was at the time of the hearing, E.T. testified: "She's a child now even though she's delayed. Now she's finally [] here with us presently. She can sit

---

[2] See Am. Psychiatric Ass'n, Intellectual Disability 1 (2013), http://www.psychiatry.org/File%20Library/Practice/DSM/DSM-5/DSM-5-Intellectual-Disability-Fact-Sheet.pdf.

down at a table. She can watch a movie." (Id. at 441:20-22.) Dr. Royston also testified that the more recent evaluations of S.C. indicated that she had made "significant progress" since leaving Pope Elementary (id. at 936:23) though all parties agree that S.C. is still significantly developmentally delayed (see Pl. Bf. at 8 n.2; DOE Bf. at 3).

V.   Administrative Proceedings

On June 2, 2011, Plaintiffs filed a request for a due process hearing. (ROA Ex. 1 ("DP Req.").) The Hearings Officer held an evidentiary hearing on April 23, May 15-18, and June 12, 2012. (ROA Ex. 27 at 2-3.)

The Hearings Officer issued a 37-page decision on August 21, 2012. (ROA Ex. 27 ("AHO Dec.").) He found that Plaintiffs failed to show that the 2009 IEP did not offer a FAPE, since (1) the performance evaluations, goals, and objectives in the 2009 IEP were appropriate, (2) the placement offered in the 2009 IEP was appropriate, and (3) Plaintiffs presented no evidence to show that the 2009 IEP had not been properly implemented. (Id. at 22-27.) He also found that Plaintiffs had failed to show that the 2010 IEP did not offer a FAPE, since (4) Plaintiffs had not shown that the performance evaluations, goals, and objectives in the 2010 IEP were inappropriate or inadequate, (5) the placement offered in the 2010 IEP was appropriate, and (6) Plaintiffs presented no evidence to show that the 2010 IEP had not been properly implemented. (Id. at 27-

34.) Finally, he found that (7) Cole Academy was also an appropriate placement for S.C. (Id. at 35-36.)

Plaintiffs appealed the Hearings Officer's decision on September 20, 2012, originally filing a Complaint. (Doc. No. 1.) The DOE filed an Answer to the Complaint on November 21, 2012. (Doc. No. 10.) Following a scheduling order by the magistrate judge (see Doc. No. 14), Plaintiffs filed an opening brief on February 28, 2013 (Doc. No. 17 ("Pl. Bf.")). The DOE filed an answering brief on March 28, 2013. (Doc. No. 19 ("DOE Bf.").) Plaintiffs filed a reply on April 11, 2013. (Doc. No. 21.)

### STANDARD OF REVIEW

Under the IDEA, "federal courts accord considerably less deference to state administrative proceedings than they do in most instances of judicial review of . . . agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." Anchorage Sch. Dist., 689 F.3d at 1053 (citation omitted). The IDEA empowers the reviewing court to hear evidence that goes beyond the scope of the administrative record and, based on a preponderance of the evidence, "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The district court thus has "broad discretion to craft relief." Ashland Sch. Dist. v. Parents of Student E.H., 587 F.3d 1175, 1183 (9th Cir. 2009).

Nonetheless, the district court may "not substitute [its] own notions of sound educational policy for those of the

school authorities [it] review[s]." K.D. ex rel. C.L. v. Dep't of Educ., 665 F.3d 1110, 1117 (9th Cir. 2011) (citation omitted). The reviewing court must endeavor to respond to the hearing officer's resolution of each material issue. Michael P. v. Dep't of Educ., 656 F.3d 1057, 1066 (9th Cir. 2011) (citation omitted). Administrative proceedings are accorded "due weight" and the reviewing court must, at least, "consider the findings carefully[.]" Anchorage Sch. Dist., 689 F.3d at 1053 (citation omitted). An administrative hearing officer's "thorough and careful" findings receive "particular deference." Id. (citation omitted). In this case, the Hearings Officer held six days of evidentiary hearings, was engaged in the hearing, and issued an extraordinarily detailed thirty-seven-page decision which thoroughly and carefully explained the factual basis for each of his conclusions. The Court will therefore accord his findings "particular deference." Id.; see, e.g., Park ex rel. Park v. Anaheim Union High Sch. Dist., 464 F.3d 1025, 1031 (9th Cir. 2006).

**DISCUSSION**

I.   Issues Properly Before this Court

Plaintiffs' opening brief attempted to bring before this Court many issues that Plaintiffs did not raise in their request for a due process hearing. This is improper.

The IDEA states that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [due process]

15

notice." 20 U.S.C. § 1415(f)(3)(B); see D.R. ex rel. Etsuko R. v. Dep't of Educ., 827 F. Supp. 2d 1161 n.12 (D. Haw. 2011) (hearings officer could not address issue that had not been raised in the due process request); see also Dep't of Educ. v. C.B. ex rel. Donna B., Civ. No. 11-00576, 2012 WL 1537454, at *8 (D. Haw. May 1, 2012) (hearings officer erred by considering issues that petitioners had not raised in their due process complaint). The district court, in turn, does not have subject matter jurisdiction to consider such claims. See J.L. v. Mercer Isl. Sch. Dist., 592 F.3d 938, 952 (9th Cir. 2009). This Court has therefore noted numerous times that it "will not consider arguments raised before this Court and not raised in the request for due process hearing." Aaron P. v. Dep't of Educ., 897 F. Supp. 2d 1004, 1018 (D. Haw. 2012) (citing 20 U.S.C. § 1415(f)(3)(B) and Haw. Admin. R. § 8-60-65(d)); see I.T. ex rel. Renee T. v. Dep't of Educ., Civ. No. 11-00676, 2012 WL 3985686, at *13 (D. Haw. Sept. 11, 2012).

Plaintiffs argued at the hearing before this Court that the boilerplate sentence in their due process request complaining of "procedural and substantive violations of the IDEA" (DP Req. at 6) suffices to raise all the extraneous issues that they attempted to bring either before the Hearings Officer or before this Court.[3/] The Court disagrees. Plaintiffs' theory would

---

[3/] The issues raised in Plaintiffs' brief on appeal but not raised in their due process request were: (1) the DOE's alleged failure to assess S.C. in all areas of suspected disability (Pl. Bf. at 35); (2) the DOE's alleged inappropriate use of the Brigance assessments (id. at 37); (3) the DOE's alleged failure

effectively render meaningless the IDEA's explicit instruction that complainants "shall not be allowed" to raise issues at the evidentiary hearing that they did not raise in the due process request. 20 U.S.C. § 1415(f)(3)(B) (emphasis added). The Court cannot apply such a theory. See Duncan v. Walker, 533 U.S. 167, 174 (2001) (it is the court's duty "to give effect, if possible, to every clause and word of a statute").

It is immaterial that appellants raised an issue at the evidentiary hearing or in their closing brief to the hearings officer below. See, e.g., James M. ex rel. Sherry M. v. Dep't of Educ., 803 F. Supp. 2d 1150, 1165 (D. Haw. 2011). Unlike a federal complaint, which the Court "should freely permit" to be amended at trial if evidence is introduced on an issue not raised in the complaint, see Fed. R. Civ. Proc. 15(b)(1), an IDEA due process request may not be amended later than five days before the start of the evidentiary hearing unless the other party consents in writing, 20 U.S.C. § 1415(c)(2)(E)(I). There is no evidence that the DOE agreed to allow Plaintiffs to amend their due process request. Indeed, the DOE in their closing brief to

---

to use assessments for their intended purposes (id.); (4) the DOE's alleged withholding of S.C.'s ABLLS evaluations from the 2009 IEP team (id. at 39); (5) the DOE's allegedly unreliable and deficient data (id. at 42); (6) the adequacy of S.C.'s behavior support plan (id. at 44); (7) the DOE's alleged failure to provide records before the 2010 IEP was issued; (8) the DOE's alleged failure to have a non-special-needs teacher present at the 2009 IEP meeting; (9) the DOE's alleged failure to conduct occupational therapy evaluations; (10) the DOE's alleged failure to conduct speech/language evaluations; and (11) the DOE's alleged "unclean hands" (id. at 57).

the Hearings officer objected to Plaintiffs' raising issues not raised in their due process request. (See ROA Ex. 25 at 2-3.)

In sum, Plaintiffs may not recast their due process request as one raising the DOE's failure to properly assess S.C. (See Pl. Bf. at 7.) Plaintiffs filed their due process request on June 2, 2011, nearly two months after receiving Dr. Cook's report and more than a year after learning about Ms. Massey's assessment. The evidentiary hearing did not begin until April 23, 2012, giving Plaintiffs plenty of time to request leave to amend, or to file a new due process request, if they decided they wished to raise new issues. They did neither.

The Court will therefore consider only the issues properly before it. Those issues are as follows: Plaintiffs challenge the Hearings Officer's first, third, fourth, and sixth findings (as numbered above). Plaintiffs also argue that the Hearings Officer improperly failed to adjudicate two issues: reimbursement for S.C.'s private speech/language and occupational therapy evaluations; and whether S.C.'s current interventions are appropriate for purposes of reimbursement.

## II.  Whether the Two IEPs' Performance Evaluations and Goals Were Appropriate

The Court considers the IEPS "at the time of [their] implementation, not in hindsight, and ask[s] if [their] methods were reasonably calculated to confer an educational benefit on the child." J.G. v. Douglas Cnty. Sch. Dist., 552 F.3d 786, 801 (9th Cir. 2008) (citation omitted).

A.    2009 IEP

The DOE collected input from numerous specialists for S.C.'s 2009 IEP, including an occupational therapist, a psychologist, and a physical therapist. (See Tr. at 25:22-32:7.) Those specialists directly drafted the appropriate sections of the 2009 IEP. (Id.) Ms. Clark, who had been S.C.'s daily preschool teacher for the previous eight months and knew her very well, was heavily involved in drafting the IEP. (See id. at 25:22-32:7.) S.C.'s mother testified that she and S.C.'s father attended the IEP meetings, reviewed the present levels of achievement, goals, and services, and were able to give input. (Id. at 393:6-19, 448:22-449:18.)

Plaintiffs at the hearing before this Court emphasized heavily Ms. Clark's handwritten note describing S.C. as "MR" and her testimony that she believed S.C. to be mentally retarded. (See Pl. Ex. 42 at 932; Tr. at 77:2-8.) Plaintiffs presented no evidence, however, that Ms. Clark's belief caused the 2009 IEP to be drafted any differently than it otherwise would have been. DOE witnesses at the evidentiary hearing testified that programming for children identified as developmentally delayed and those identified as mentally retarded is the same, and that programming is based on the needs of the individual child, not the label applied to them. (Tr. at 77:12-17, 994:24-995:21.) As to Ms. Clark herself, there is no evidence that she believed S.C. could not progress; indeed, Plaintiffs argued at the hearing

19

before this Court that Ms. Clark's estimates of S.C.'s progress in her class were inflated.

The 2009 IEP itself contains four full pages of single-spaced text describing S.C.'s present levels of achievement and needs. (2009 IEP at 44-47.) It goes on to lay out detailed goals for each area of S.C.'s development, including language skills, mathematics, and self-help routines. (Id. at 49-57.) There is no evidence that at the time of drafting S.C.'s parents thought any of the contents of the 2009 IEP were inaccurate.

Plaintiffs' arguments in their brief largely consist of nitpicking at the precise wording of the Hearings Officer's decision. (See Pl. Bf. at 48-52.) For instance, Plaintiffs take issue with the Hearings Officer's statement that S.C. "has a tendency to place things in her mouth," on the grounds that it "trivializes" S.C.'s "unsafe, maladaptive behaviors," since S.C. constantly places non-food items in her mouth. (Id. at 48 n.24.) The record shows, however, that S.C.'s parents were present during the drafting of the 2009 IEP and apparently did not object to the IEP's statement that S.C. "needs encouragement to keep things out of her mouth." (2009 IEP at 44.) Indeed, Plaintiffs' own due process request stated that S.C. "frequently puts things to her mouth." (DP Req. at 5.)

Plaintiffs have presented no convincing argument that the Hearings Officer erred in concluding that the evaluations and goals contained in the 2009 IEP were reasonable at the time they were drafted. See J.G., 552 F.3d at 801 (school district

"reasonably calculated" IEPs "based on the tests that the District could validly administer" at the time the IEPs were drafted). The Hearings Officer fairly found that assessments of S.C. performed months or even years later, while relevant, were not sufficient to prove that the 2009 IEP was invalid <u>at the time it was drafted</u>. (AHO Dec. at 24.)

B.    2010 IEP

Again, the Court must evaluate an IEP at the time it was drafted, not in hindsight. Plaintiffs' argument as to the 2010 IEP consists of a single sentence,[4] which refers to Ms. Massey's statement that S.C.'s functioning was consistent with "a significant level of mental retardation." (DOE Ex. 52 at 394.) Dr. Royston, who performed some of the assessments that went into Ms. Massey's report and reviewed the report before it was finalized, explained at the hearing that S.C. was at the time "functionally within the range" of mental retardation, but that this was not a diagnosis of mental retardation because S.C. was too young to draw any firm conclusions about her future development. (Tr. at 925:10-23; <u>see</u> <u>id.</u> at 947:12-24.) Ms. Clark testified that there was no significant difference between

---

[4] That sentence refers to material "<u>infra</u>", and in the next section Plaintiffs attempt to incorporate by reference part of their closing brief to the Hearings Officer. (<u>See</u> Pl. Bf. at 57.) Under Rule 10(c), parties may incorporate by reference only pleadings or exhibits to pleadings. <u>Swanson v. U.S. Forest Serv.</u>, 87 F.3d 339, 345 (9th Cir. 1996); <u>see</u> <u>Horsley v. Feldt</u>, 304 F.3d 1125, 1134 (11th Cir. 2002). A pleading is a complaint, an answer, or a court-allowed reply to an answer – not a motion or other paper. Fed. R. Civ. P. 7. There is no authority for Plaintiffs' attempt to incorporate briefing from the administrative proceedings below.

programming for a developmentally delayed child and that for a mentally retarded child. (Id. at 77:2-17.)

Ms. Massey's choice of words might have been poor - and understandably was very upsetting for S.C.'s parents – but there is no question that S.C. was severely developmentally delayed, and, importantly, Plaintiffs have presented no evidence that Ms. Massey's use of the phrase "mentally retarded" caused the IEP team to create inappropriate goals or evaluations for S.C. (Indeed, the 2010 IEP does not contain the phrase "mentally retarded" or any other equivalent term.) Regardless of the label used for S.C.'s delayed development, the 2010 IEP once again contained a very detailed description of S.C.'s current levels of achievement, with which, once again, S.C.'s parents did not find fault.

Ms. Massey's report also declined to diagnose S.C. with an autism spectrum disorder. (DOE Ex. 52 at 390.) Plaintiffs now believe, based on Dr. Cook's assessment a year and a half after Ms. Massey's and Dr. Royston's assessment, that S.C. does have an autism spectrum disorder. (See Pl. Bf. at 8 & n.2.) Dr. Royston testified, however, that Dr. Cook's assessment omitted one of the tests that is considered the "gold standard" when testing for autism, and that Dr. Royston could not have performed in April 2010 one of the tests that Dr. Cook performed in December 2011, because in April 2010 S.C. did not yet have the cognitive ability

to undergo the test. (Tr. at 928:1-20, 934:11-19.)[5] An IEP can only be based on assessments that the local educational agency "could validly administer" at the time it was drafted. J.G., 552 F.3d at 801. Most importantly, Plaintiffs presented no evidence that Ms. Massey or Dr. Royston performed their assessments negligently or did not accurately report what they observed.

The record shows that the DOE performed numerous assessments and observations of S.C. in preparation for the 2010 IEP. (DOE Exs. 47-52.) Again, S.C.'s parents attended the IEP meetings, reviewed the performance evaluations and goals and objectives, and did not find fault with them. (Tr. at 449:4-450:9.) And again, the Hearings Officer fairly found that assessments of S.C. performed months or even years later were not convincing evidence that the 2010 IEP was invalid at the time it was drafted. (AHO Dec. at 29-30.)

III. Whether the Two IEPs Were Properly Implemented

The Ninth Circuit's standard for implementation claims was set out in Van Duyn, 502 F.3d at 820-25. Under the IDEA, special education "need only be provided 'in conformity with' the IEP." Id. at 821 (quoting 20 U.S.C. § 1401(9)(D) (emphasis added)). "There is no statutory requirement of perfect adherence

---

[5] This appears to have been a general difficulty with S.C.'s early assessments. Michelle Goldstein, a DOE physical therapist, testified that in spring 2010, "[b]ased on [S.C.'s] skill level, pretty much any formal or standardized test that would have been done would have been biased against her because of her global delays. So it wouldn't have been reliable, as well as it wouldn't have provided us any additional information." (Tr. at 767:18-768:2.)

to the IEP, nor any reason . . . to view minor implementation failures as denials of a [FAPE]." Id. Implementation failures do not violate the IDEA if the "significant provisions" of the IEP were followed and, as a result, the child "received an educational benefit." Id. (quoting Bobby R., 200 F.3d at 349).

Only a material failure to implement an IEP violates the IDEA. Id. at 822. "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." Id. Although the materiality standard "does not require that the child suffer demonstrable education harm in order to prevail," the child's educational progress "may be probative of whether there has been more than a minor shortfall in the services provided." Id.

In this case, Plaintiffs have not shown that the Hearings Officer erred in finding that both the IEPs were materially implemented. The Hearings Officer correctly noted that Plaintiffs presented no evidence to show that the DOE did not provide S.C. with any of the services listed in either IEP. Although Ms. King testified that the DOE staff were not properly administering S.C.'s "sensory diet" during Ms. King's observations (see, e.g., Tr. at 491:2-492:18), Ms. Clark testified repeatedly that the IEPs, including the sensory diet, were fully implemented (see id. at 18:1-9, 53:1-3; 68:16-69:2). The Hearings Officer explicitly credited the testimony of the DOE witnesses who were most familiar with S.C.'s progress and daily

activities while she was at Pope Elementary. (AHO Dec. at 34-35.) The Court is not inclined to disturb the Hearings Officer's credibility determinations without convincing evidence that they were wrong.

In <u>Van Duyn</u>, the Ninth Circuit noted that a child's lack of educational progress may be probative of whether there was a material failure to implement the child's IEP. 502 F.3d at 822. In this case, it is quite clear that S.C. progressed further while at Cole Academy than she did while at Pope Elementary. It is also quite clear, however, that S.C. did progress, albeit slowly, while at Pope Elementary. (<u>See</u> DOE Bf. at 22-25.) Plaintiffs have failed to link S.C's slow progress while at Pope Elementary to any failure to implement the IEP. Rather, on the record before the Court, it seems equally plausible that the education S.C. received at Pope Elementary provided a strong start for S.C.'s development, which then continued at Cole Academy. As Dr. Royston, the DOE's psychologist, testified, "rate of progress frequently snowballs. So it starts slowly and then as you gain more and more momentum you see it faster and faster. If we're making good developmental gains that's what happens." (Tr. at 948:15-19.)

Moreover, the fact that S.C.'s progress accelerated under Ms. King's programming is not proof that the education offered by the DOE did not meet the IDEA's standards. The Ninth Circuit has repeatedly reminded parents that "[a]n appropriate public education does not mean the absolutely best or potential-

maximizing education for the individual child." E.g., Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1474 (9th Cir. 1993) (citation omitted). Rather, the state's obligation is to provide "a basic floor of opportunity" through an "individually designed" program. Id. Here, Ms. King's program provided hours of one-on-one therapy outside of the classroom setting. Ms. King's testimony reveals her to be a dedicated and thoughtful assistant behavioral analyst. It is hardly surprising that S.C. would make significant progress in such a setting. That does not mean, however, that the DOE was obliged to provide such an intensive program. The Hearings Officer found that the DOE provided the "basic floor of opportunity" required by the IDEA. Plaintiffs have presented no convincing argument that he was wrong to conclude that the DOE's program provided S.C. a "meaningful educational benefit", even if not the "potential-maximizing" program for S.C.

IV.  Reimbursement for Private Evaluations and Appropriateness of S.C.'s Private Interventions

        Plaintiffs' due process request sought reimbursement for: (1) Cole Academy's fees for the 2010-11 school year and extended school year; (2) the private evaluations of S.C.; (3) Ms. King's services; (4) the services of a skills trainer at school and after school; and (5) private speech/language and occupational therapy services. (DP Req. at 6-7.) Plaintiffs also sought compensatory education for the 2011-12 school year. (Id. at 7.)

A parent or guardian is "entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the [IDEA]." <u>C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.</u>, 635 F.3d 1155, 1159 (9th Cir. 2011) (citation omitted); <u>see</u> <u>Carter</u>, 510 U.S. at 15; 20 U.S.C. § 1412(a)(10)(C). If either criterion is not met, the parent or guardian may not obtain reimbursement. <u>C.B.</u>, 635 F.3d at 1159. Similarly, compensatory education is "a remedy for the harm a student suffers while denied a FAPE." <u>R.P.</u>, 631 F.3d at 1126.

The Hearings Officer concluded, and the Court concurs, that Plaintiffs had not met their burden of demonstrating that the public placement offered by the DOE violated the IDEA by not offering S.C. a FAPE. Plaintiffs therefore are not entitled to reimbursement or compensatory education.[6]

---

[6] Plaintiffs argue that the Hearings Officer wrongfully failed to consider reimbursement for the costs of the private evaluations of S.C. and the appropriateness of S.C.'s extra services while attending Cole Academy. (Pl. Bf. at 47.) There was no need for the Hearings Officer to consider these issues, however, since he had concluded that Parents were not entitled to reimbursement.

## CONCLUSION

For the foregoing reasons, the Court AFFIRMS the Hearings Officer's decision of August 21, 2012. There are no issues for remand.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 16, 2013



_____
Alan C. Kay
Sr. United States District Judge

S.C. v. Dep't of Educ., Civ. No. 12-00524 ACK BMK, Order Affirming
Administrative Hearings Officer's Findings of Fact & Conclusions of Law